Ex. E

1

2     UNITED STATES DISTRICT COURT

3     SOUTHERN DISTRICT OF NEW YORK

4     ----------------------------------------------X

5     UMAR GUIRA, an infant, by his mother and

6     natural guardian ASSETA NANEMA, and ASSETA

7     NANEMA, individually,

8                             Plaintiffs,

9          - against -              Index No.:
                                     21-cv-02615-VEC
10     UNITED STATES OF AMERICA,

11                             Defendant.

12     ----------------------------------------------X

13                             March 16, 2022
                               2:00 p.m.
14

15          VIRTUAL DEPOSITION of

16     DR. DANIEL ADLER, appearing on behalf of the

17     Plaintiff herein, taken by the Defendant,

18     pursuant to Notice, taken before Nicole L.

19     Basile, a Notary Public within and for the

20     State of New York.

21

22

23

24

25

1                    ADLER

2        A.   I use a dictation service.  It's

3   dictated into a recording device, the file is sent

4   over the internet and someone transcribes it.

5        Q.   Other than the typist you referred to

6   and yourself, did anyone else work on this report?

7        A.   No.

8        Q.   You have produced two reports in this

9   case.  Is that correct?

10       A.   Correct.

11       Q.   And there's one which we're looking at

12  now, which is dated November 19, 2021, which appears

13  at Pages 1 through 7 of this PDF and beginning at

14  Page 8 of the PDF is a second report dated October

15  19, 2020.  Are these the two reports that you

16  prepared in this case?

17       A.   They are.

18       Q.   Did your opinions change in any way

19  between these two reports?

20       A.   No.

21       Q.   Which one of these two reports contains

22  a complete set of your expert opinions in this

23  matter?

24       A.   I would say the most, you know, the 2021

25  report I think was designed to update and replace

1                          ADLER

2    the other report.

3          Q.   So when we talk about your report in

4    this matter, can we have the understanding that

5    we're talking about this November 2021 report?

6          A.   Yes.

7          Q.   Have you had a chance to review your

8    report between November 19, 2021 and today?

9          A.   I have.

10         Q.   And in reviewing your report, did you

11   find anything that you wanted to change or correct?

12         A.   No.

13         Q.   And is there anything that you -- any

14   materials that you have reviewed since preparing

15   this report, that have changed your opinions in

16   anyway?

17         A.   No.

18         Q.   Did you reach conclusions in this

19   matter?

20         A.   Yes.  They're outlined in my report.

21         Q.   And if you could provide to me a general

22   summary of what conclusions you reached in this

23   matter?

24         A.   Sure.  Umar Guira has a permanent

25   brachial plexus injury, involves his right arm, a

1                          ADLER

2    what she believes would be the impact of the arm on

3    his future as a vocational expert.  As I said

4    earlier, I don't testify as a vocational expert.  I

5    don't offer jobs and -- but I think that she is

6    suggesting that some accommodations would be

7    required going forward.

8           Q.   Are you offering an opinion, one way or

9    another, in a response to what she's opining on?

10          A.   I wouldn't offer an opinion as a

11   vocational expert.  I would offer an opinion as a

12   neurologist saying that the types of things that she

13   refers to make sense to me neurologically.  In terms

14   of the types of needs that he would require and she

15   does -- and she does base -- repeats also on Dr.

16   Molofsky's examination, which I, again, I said I'm

17   in general agreement with.

18          Q.   Well, I think we can turn to causation.

19   Are you offering an opinion as to what caused Umar

20   Guira's brachial plexus injury?

21          A.   Yes.

22          Q.   And what is the opinion that you are

23   offering?

24          A.   The head moved in a way to stretch the

25   nerves beyond their point of tolerance and there was

1                          ADLER

2    tearing of the -- of the fifth and sixth cervical

3    nerves in some form.  Probably a neuroma, which is a

4    scar that involves the fifth and sixth cervical

5    nerves and that this permanent injury occurred after

6    the head delivered.  Dr. Bui put forth efforts to

7    deliver the baby and in doing so caused the nerves

8    to be stretched and torn.

9         Q.   And what is the basis of this opinion?

10        A.   The totality of the medical record, the

11   fact that the arm was weak immediately after birth

12   proves that it's related to a labor and delivery

13   event, and my opinion as a pediatric neurologist

14   that injuries of this type do not occur at anytime

15   in a healthy newborn, meaning, without other medical

16   conditions or deformities does not occur except

17   after the head delivers and the doctor moves the

18   head.

19        Q.   Are there specific sources of medical

20   literature that you relied upon in reaching that

21   opinion?

22        A.   Pediatric neurology textbooks refer to

23   this injury occurring in this matter with traction,

24   meaning, stretching of the nerves is the cause,

25   which is related to the delivery process and

1                              ADLER

2   goes onto say, "with further analysis, theory

3   emerges concerning alternative phenomenon that may

4   be at play in the pathogenesis of non-shoulder

5   dystocia BPP seems biologically implausible that

6   hypoxic stress would produce a preferable nerve

7   injury.  Therefore, associated with fetal acidosis."

8   And then it goes onto say, "decreased muscle tone

9   associated with acidosis may adversely affect fetal

10  posture and this maladaptation may predispose" and

11  it goes onto say "the injury".  So that's -- that's

12  my opinion.

13          Q.   I'm gonna ask you, was there a shoulder

14  dystocia in this case?

15          A.   In your case, no.  But -- but -- but

16  there are at least two articles that suggest that

17  shoulder dystocia is not appreciated in every

18  instance when a shoulder dystocia has in fact

19  occurred.  I'm not saying that Dr. Bui missed the

20  diagnosis because that's a post obstetrical

21  diagnosis of an obstetrician into whether shoulder

22  dystocia was present or not.  But I would say that

23  based on literature that -- that I understand, that

24  the mere fact that someone says that there wasn't

25  shoulder dystocia doesn't mean that it's true.  And

1                           ADLER

2    if you look at my report, I'm not saying that

3    shoulder dystocia is required.  I'm saying the head

4    delivered.  I'm not writing the head delivered in

5    the presence of a shoulder dystocia.  I'm simply

6    saying the head delivered and then the head was

7    moved, and that caused the injury.  There is no --

8    I'm gonna say one other thing.  There is no proof in

9    this case in the medical records that a posterior

10   shoulder in this case came into contact with the

11   sacral promontory in anyway whatsoever.  So to say

12   that it was posterior shoulder got injured there,

13   that would be pure speculation.  They don't know

14   that that happened.  They're just saying -- he said

15   those things happen so it happened.  I don't think

16   that's right.

17        Q.   Is that similar to your conclusion that

18   there must have been improper traction because an

19   injury occurred?

20        A.   No.  I -- I'm -- I'm -- first of all, I

21   don't use the word traction in my report and I

22   certainly wouldn't say under any circumstance, that

23   Dr. Bui acted improperly, because that's an

24   obstetrical opinion.  And I'm not saying that.  I'm

25   simply saying that the head delivered, Dr. Bui moved

1                          ADLER

2   the head and the injury was the result.  I'm not

3   qualifying the movement that she created.  I'm

4   simply saying she did.

5           Q.   What is the basis of your conclusion

6   that that movement is what caused the injury?

7           A.   An injury of this like had never been

8   reported to occur on intrauterine basis.  And any

9   newborn that was healthy and non-asphyxiated.  This

10  baby was healthy and non-asphyxiated.  Therefore, the

11  injury could not occur, had never occurred, has

12  never been reported to occur on an intrauterine

13  basis.  It must and can only occur after the head

14  delivers and then the doctor moves the head.  That's

15  the only way it occurs, in my opinion.  That's the

16  basis of my opinion in this case.  It doesn't occur

17  in any other way, other than in manner in which I'm

18  defining.  We know the head was moved and that's the

19  cause of the injury.

20          Q.   Are you offering any sort of opinion as

21  to how much of the movement of the head is required

22  for the injury to have occurred?

23          A.   No.  That's an obstetrical opinion,

24  meaning -- or how the head was moved.  You know,

25  there's experiments that say if you move the head

1                        ADLER

2   off axis more than 30 to 45 degrees, you create a

3   degree of tension along the nerves that puts them at

4   risk.  But I would make that statement but that's a

5   general statement.  I'm not saying what Dr. Bui did

6   or didn't go in terms of how far the head moves or

7   far she moved the head, other than it's clear that

8   she moved it in a matter sufficient to cause the

9   injury.

10          Q.   And your basis for the conclusion that

11  she must have moved the head is nature of the

12  injury?

13          A.   Correct.  The injury is proof of what

14  happened.

15          Q.   I'm getting close to the end.

16               Let me ask you -- let me ask you about a

17  statement on Page 7 of your report, which I will --

18  sorry.  I hit the wrong button.

19          A.   Page 7?

20          Q.   Yes.  Page 7 of your report.  In the top

21  paragraph you make the statement at the end of that

22  top paragraph, "all of the treatment provided to

23  Umar Guira as a result of these permanent and

24  continuing neurological disabilities has been

25  medically necessary and appropriate."  What