UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X

UMAR GUIRA, an Infant by his Parent and
Natural Guardian, ASSETA NANEMA and
ASSETA NANEMA, individually,

      Plaintiffs,    21 Civ. 2615 (VEC)

  v.

UNITED STATES OF AMERICA,

      Defendant.

----------------------------------------------------------------- X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION *IN LIMINE* TO PRECLUDE CERTAIN EXPERT TESTIMONY OF DR. RICHARD L. LUCIANI AND DR. DANIEL ADLER**

DOUGLAS & LONDON, P.C.
Attorneys for Plaintiff

BY: */s/ Randolph Janis*
Randolph Janis
59 Maiden Lane, 6th Floor
New York, New York 10038
(212) 566 7500

# TABLE OF CONTENTS

**Page:**

Introduction..................................................................................................1

Argument....................................................................................................7

I. Legal Standard.........................................................................................7

   A. Legal Standard for Admissibility of Expert Testimony...................................7

II. The Causation Opinions of Dr. Luciani and Dr. Adler are Admissible Under Federal Rule of Evidence 702..........................................................................................8

   A. Plaintiffs Experts are Not Offering Testimony Based Solely on the Premise that a Brachial Plexus Injury Occurred Ergo Dr. Bui Applied Excessive Traction............8

   B. Plaintiff's Experts Should Not Be Precluded From Offering Opinions Contesting Defendants Assertion That Permanent Brachial Plexus Injuries Can Be Caused by Natural Forces of Labor..............................................................................10

Conclusion................................................................................................15

TABLE OF AUTHORITIES

Cases

*Arista Records LLC v. Usenet.com, Inc.* 608
F. Supp. 2d 409, 422 (SDNY 2009)..................................................................................7

*Ambrose v. Brown*,
96 N.Y.S.3d 414..................................................................................................13

*Bayer ex rel. Petrucelli v. Dobbins*,
885 N.W.2d 173 (Wis. Ct. App. 2016)..................................................................11

*Castro v. United States*,
2016 WL 5942354 (M.D. Fla. Oct. 13, 2016)..........................................11, 14, 15

*Clark ex rel. Clark v. Heidrick*,
150 F.3d 912 .........................................................................................................11

Cortez v. Thaker
Docket No.: 05-L-160, Circuit Ct., Lake County, Illinois......................................6

*D'Amore v. Cardwell*,
2008 WL 852791 (Ohio Ct. App. Mar. 31, 2008) ...............................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)................................................................................................7

*Estate of Ford v. Eicher*,
250 P.3d 262 (Colo. 2011)....................................................................................11

*L.M. ex rel. Dussault v. Hamilton*,
200 Wash. App. 535 (2017)...................................................................................13

*Lawrey v. Good Samaritan Hosp.*,
751 F.3d 947 (8th Cir. 2014) ................................................................................11

*Lawrey v. Kearney Clinic, P.C.*,
2012 WL 3583164 (D. Neb. Aug. 20, 2012) .......................................................11

*Muhammad v. Fitzpatrick*,
937 N.Y.S.2d 519 .................................................................................................13

*Nobre ex rel. Ferraro v. Shanahan*,
976 N.Y.S.2d 841 (2013)..................................................................................................4

Parker v Mobil Oil Corp
7 NY3d 434.....................................................................................................................13

*Potter ex rel. Potter v. Bowman*,
2006 WL 3760267 (D. Colo. Dec.18, 2006) ..................................................................11

*Salvant v. State*,
935 So.2d 646 (La. 2006) ...............................................................................................11

Seiber v. Antkowiak
Case No.: 11-CV-000942. (Wis. Circuit Court, Milwaukee County)................................6

*Silong v. United States*,
2007 WL 2535126 (E.D. Cal. Aug. 31, 2007).................................................................11

*Taber v. Roush*,
316 S.W.3d 139 (Tex. App. 2010)..................................................................................11

*Williams v. United States*,
455 F. Supp. 3d 403 (E.D. Mich. 2020)..........................................................................11

Rules

Fed. R. Evid. 702........................................................................................................7, 8

Plaintiffs respectfully submits this memorandum of law in opposition to defendant's motion *in limine* seeking to have Plaintiffs' experts precluded from *certain* testimony, more specifically (1) from offering testimony that brachial plexus injuries "must result" from the clinician applying excessive traction to a baby's head and neck during delivery and (2) from offering testimony that permanent brachial plexus injuries cannot be caused by natural forces of labor.

## INTRODUCTION

Movant makes this motion from shaky ground. The defense experts within their exchanged reports offer nothing but bare and conclusory opinions about the subject of maternal forces being the cause of infant U.G.'s undisputed permanent Erbs Palsy injury. Defense expert Keith Eddleman, M.D., (an Ob/Gyn), in his expert report concedes "I have **basic** knowledge about BPI [brachial plexus injuries]" and then speculates that "It is also **possible** that the BPI occurred before delivery. The mechanism for such an injury is fetal malpositioning in the uterine cavity that causes excessive prolonged stretching of the brachial plexus nerve roots." [Emphasis added]. (Janis Decl. Ex 4). Defense expert Walter J. Molofsky, M.D., a pediatric neurologist, offers an equally conclusory opinion that "There is nothing in the records to indicate that anything untoward happened" (Janis Decl. Ex 2) [wholly dismissing the parents eyewitness testimony about Dr. Bui forcefully pulling the infant's head during the delivery]. (Janis Decl. Ex 8, pp. 20; 22, lines 22-23, and Ex 9, pp.14-15). Thus, he concludes, "It is thus my opinion that the brachial plexus injury noted at birth was due to intrinsic forces of labor and delivery that effected the posterior arm." (Janis Decl. Ex 2). Dr. Bui, the delivering physician, did not offer an opinion supporting maternal forces as a specific cause of U.G.'s Erbs Palsy in this case. At her deposition, Dr. Bui identified potential causes of neonatal brachial plexus palsy (NBPP) injuries that can be secondary to in utero mechanisms. (Janis Decl. Ex 7). She testified that, in utero, it can occur

1

with malpositioning or trauma in utero, in particular compression trauma. But she was unable to opine that either malpositioning or compression trauma occurred in this case. Asked at her deposition whether there was fetal malpositioning or compression trauma, Dr. Bui testified "I don't know". (Janis Decl. Ex 7, p. 24, lines 2-14).

Movant presents this motion to this Honorable Court having omitted from movant's presentation the eyewitness testimony of the mother and the father (Janis Decl. Ex 8-9); both of whom testified they witnessed Dr. Bui forcefully pulling U.G.'s head during the delivery. (Janis Decl. Ex 8, pp. 20; 22, lines 22-23, and Ex 9, pp.14-15). This critical omitted testimony belies movant's contention that Plaintiffs' experts are opining, a priori, that because Erbs Palsy occurred ergo excessive force was used by Dr. Bui.

More so, Dr. Daniel Adler, Plaintiffs' pediatric neurology expert, in his expert report opined that there can be other alternative causes to a brachial plexus to a newborn other than excessive traction exerted by a healthcare provider including cancer, infection and rarely stretching of nerves can be exaggerated when the fetus has muscle atrophy in the head and neck or suffers intrapartum hypoxia sufficient to cause fetal hypotonia and acidosis. U.G., he opined, has none of the foregoing medical conditions. (Janis Decl. Ex 1). Dr. Luciani offered similar opinions. (Janis Decl. Ex 3). Point being is that neither expert simply worked backward from the incident of Erbs Palsy to an opinion that it "must result" from excessive traction.

Movant also seeks to have Plaintiffs experts precluded from offering testimony that permanent brachial plexus injuries cannot be caused by the natural forces of labor. In fact, Dr. Adler did not opine that same is impossible. Rather, he stated that NFOL has not been proven to be the cause of a permanent neonatal brachial plexus injury when the fetus does not have exaggerated risk of nerve stretch. (Janis Decl. Ex 1). More specifically, Dr. Adler testified that

injuries of this type do not occur in a healthy newborn, without other medical conditions or deformities, [i.e. with low injury tolerance]. (Janis Decl. Ex 5).

Movant's main support for their motion is the ACOG Compendium from 2014. (Janis Decl. Ex 10). Movant's reliance on same is misplaced and flawed in that same does not state that NFOL can cause permanent NBPP.

Notably in L.M. ex rel. Dussault v. Hamilton, 200 Wash. App. 535 (2017), relied upon by movant, the court referenced the subject ACOG compendium, to wit:

> ACOG issued an important report in 2014 entitled Neonatal Brachial Plexus Palsy. This report discusses anterior shoulder NBPP to explain that an infant with low injury tolerance might suffer transient or persistent NBPP due to NFOL absent obstetric maneuvers.

The terminology selected in this ACOG compendium is critical in that it states that NFOL can cause transient or "persistent" NBPP. Dr. Adler testified that "persistent is not permanent." (Janis Decl. Ex 5. P 87., line 14). Persistent is defined as "continuing to exist or endure over a prolonged period" while permanent is defined as "lasting or intended to last or remain unchanged indefinitely". See, https://languages.oup.com/google-dictionary-en/. Thus despite movant's contention to the contrary, the ACOG compendium does not state that NFOL can cause a permanent NPBB. Dr. Adler testified about distinctions between transient, early persistent, persistent, late persistent and permanent. (See, Janis Decl. Ex 5, p. 78, 7-22; 81-82).

The compendium states "Maternal forces alone are an accepted cause of at least transient NBPP by most investigators." (Janis Decl. Ex 10).

More so, this ACOG compendium suggests that transient or persistent NBPP secondary to maternal forces requires impaction of the shoulder but in this case Dr. Bui contends that the delivery was atraumatic and absent shoulder dystocia. (Janis Decl. Ex 18).

3

Dr. Adler further points out that in the executive summary of the subject ACOG Compendium Dr. Robert Gherman wrote, in part, "both maternal (endogenous) forces and clinician-applied (exogenous) forces have a direct effect on the fetus as a whole and on its discrete anatomic structures." Dr. Adler agrees with this." (Janis Decl. Ex 5. pp.83-84). Dr. Gherman, further wrote, in regards to same, "Maternal forces alone are an accepted cause of at least transient neonatal brachial plexus palsy." (Janis Decl. Ex 5. P. 84, lines 6-8). Dr. Adler points out that Dr. Gherman, within this executive summary of the subject Compendium, does not state that maternal forces causes permanent injury. (Id. at line 9). Dr. Gherman further states that NBPP can be caused by traction applied by the birth attendant. (Id. at lines 10-12). Dr. Alder further points out that Michele Grimm, Ph.D. who authored chapter 3 of the Compendium "doesn't say that permanent brachial plexus is caused by maternal forces". Id at lines 14-17). Dr. Adler goes on to discuss Michele Grimm and her reliance on the now infamous Lerner-Salamon article. (Id. at 85-86). Dr. Adler refers to this article as "fantasy that they created so that people can testify about it" and Dr. Adler explains his basis for same. (Id.). Dr. Adler refers to the Lerner Salamon article as being "totally false.....that article is a piece of junk." (Janis Decl. Ex 5. P. 87-88).

The NFOL theory was built on a faulty premise, i.e., the Lerner-Salamon article. (Janis Decl. Ex 11). There is a cloud that remains over the Lerner-Salamon article as pointed out by court in Nobre ex rel. Ferraro v. Shanahan, 976 N.Y.S.2d 841 (2013).

By way of background, in March, 2008, the American Journal of Obstetrics and Gynecology (AJOG) published an article entitled "Permanent brachial plexus injury following vaginal delivery **without physician traction or shoulder dystocia**," (emphasis added) written by physicians Dr. Henry M. Lerner and Dr. Eva Salamon. (Janis Decl. Ex 11). This article was a

case study about a female infant who was noted to have Erb's palsy immediately after vaginal birth. At the time the article in AJOG was written, the infant was eight years old, and her Erb's palsy was permanent. The authors of the report, Dr. Henry Lerner and Dr. Eva Salomon, describe this report as the **"first unambiguous case of a baby born vaginally without physician traction, and even without the occurrence of shoulder dystocia, that resulted in a permanent brachial plexus injury."** (Id.).

The authors Dr. Salamon and Dr. Lerner failed to disclose in this article that a lawsuit was triggered from the subject birth, i.e. Pamela WILSON, Individually and as Parent and next friend of [G.W.], minor child v. Eva J. SALAMON, M.D., and Bond Clinic, P.A., Case No. CG-G01-1023, (Polk County, Florida). Ms. Wilson filed her complaint on March 15, 2001, alleging that her daughter sustained personal injuries at the time of her birth on March 17, 1999, as the result of the negligence of Eva J. Salomon, M.D., and Bond Clinic, P.A. In said malpractice action, Dr. Salamon was the defendant against whom it was claimed she negligently delivered the infant causing Erbs Palsy and, co-author, Dr. Lerner was the defense expert. (Janis Decl. Ex 14 and Ex 16).

Since its publication the Lerner-Salamon article has become a central part of the defense bars argument that permanent brachial plexus injury can occur in the absence of physician applied traction during delivery. As evidenced by the reference to the Lerner-Salamon article in the *"American College of Obstetrics and Gynecology Task Force on Neonatal Brachial Plexus Palsy (2014)"* the Lerner-Salamon article is now a key piece of the defense argument in nearly every brachial plexus case. (Janis Decl. Ex 10).

Movant relies, in part, upon the American College of Obstetricians and Gynecologists "Neonatal Brachial Plexus Palsy," (Janis Decl. Ex 10) specifically Chapter 3: Pathophysiology

and Causation, pp. 23-39, which cites the Lerner-Salamon article, and was primarily compiled by Michelle Grimm, Ph.D., a biomechanical engineer (who regularly testifies on behalf of defendants in Erb Palsy cases) [Janis Decl. Ex 12].

The Lerner-Salamon article is not infamous merely for the authors gross oversights in failing to disclose their potential bias but rather because the facts are mispresented. Dr. Salamon testified in the associated malpractice case pertaining to the birth of the subject infant that "[F]or every delivery I use gentle traction", (Janis Decl. Ex 15) and the medical chart for infant documents that shoulder dystocia did occur. See (Janis Decl. Ex 16), i.e. page from medical chart of infant G.W. evidencing documented "shoulder dystocia" twice on same page. This debunks the main premise of the Lerner-Salamon article, which describes a supposed "unambiguous case of a baby born vaginally without physician traction, and even without the occurrence of shoulder dystocia, that resulted in a permanent brachial plexus injury."

Following the publication of the Lerner case report, Dr. Lerner testified as a medical expert on May 5, 2008, in the matter of *Cortez v. Thaker, M.D.*, Docket No. 05-L-160, Circuit Court, Lake County, Illinois, in defense of a physician involved in litigation concerning a brachial plexus injury. At the *Cortez v. Thaker, M.D.* trial, Dr. Lerner was cross-examined about the Lerner/Salamon article. (Janis Decl. Ex 17). Dr. Lerner testified that there was, in fact, evidence of traction at the subject infant's delivery and that the medical records did, in fact, indicate a shoulder dystocia, in direct contradiction to the article he co-authored. Dr. Lerner also testified that apparently neither he nor Dr. Salamon read the delivery record before preparing the Case Report. *Id.*

In Seiber v. Antkowiak, et al, Case No. 11-CV-000942, (Wis. Circuit Court, Milwaukee Cty) the Court precluded the Lerner-Salamon article. The trial judge in *Seiber*, Judge Foley,

6

succinctly set forth why the Lerner-Salamon article meets no standard for reliability in his Opinion and Order, when he stated:

*"[I]t seems inconceivable to me that a learned treatise doesn't have to meet the* Daubert standard at least in my mind. If with the advent of the Daubert standard in order to qualify as learned, the treatise has to meet the Daubert standard because otherwise it isn't learned. I don't think this meets the Daubert standard.

> ***If this man were here and were - - you were offering him as a live expert and I had a motion in limine to bar his testimony based upon the admitted errors in the process by which he comes to the conclusions that we now have an established case in which this type of injury occurs with a normal birth process with no traction and with no shoulder dystocia, and then he turns around and in another lawsuit and says there was a shoulder dystocia and I don't know if there was traction involved or not, that doesn't meet the Daubert standard.***
>
> ***It's an unreliable process. It's an unreliable reasoning process. It's an unreliable study, et cetera. "***
>
> ***"..[W]e let this stuff in because it has indicia of reliability. This thing has so many indicias of nonreliability that it's - - it's just out there."***

*See* (Janis Decl. Ex 13) at pp. *4-6* (emphasis added).

## ARGUMENT

### I. LEGAL STANDARDS

#### A. Legal Standard for Admissibility of Expert Testimony

The Federal Rules of Evidence adopt a general approach of relaxing the traditional barriers to opinion testimony and embody a governing principle favoring admissibility. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587-588 (1993).

Rule 702 codifies a liberal admissibility standard and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Arista Records LLC v. Usenet.com, Inc.* 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009).

Rule 702 lays out a three prong inquiry to determine whether testimony by a party's

7

expert should be deemed admissible, (1) whether a witness is qualified, (2) methodology and reasoning underlying an expert's conclusions, (3) assessing the relevance of the proffered expert's testimony to determine whether the conclusions it draws will aid the factfinder in answering the questions at issue in the case.

Movant's focus is on the second prong. Movant does not dispute prong one or prong three. As to prong two, movant does not dispute that excessive traction by the birth attendant can cause Erbs Palsy. As to prong two, movant focuses on two contentions (1) movant's (erroneous) assertion that Plaintiffs experts testified that brachial plexus injuries "must result" from the clinician applying excessive traction to a baby's head and neck during delivery (i.e. Erbs Palsy occurred ergo excessive traction used) and (2) movants assertion that permanent brachial plexus injuries can be caused by natural forces of labor.

## II. THE CAUSATION OPINIONS OF DR. LUCIANI AND DR. ADLER ARE ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 702

### A. Plaintiffs Experts Are Not Offering Testimony Based Solely on the Premise that a Brachial Plexus Injury Occurred Ergo Dr. Bui Applied Excessive Traction.

This premise of defendant's motion is flawed. Movant seeks to preclude plaintiffs' experts from opining that brachial plexus injuries "must result" from the clinician applying excessive traction to a baby's head during delivery. Movant contends that this purported opinion of Plaintiffs experts is contrary to peer reviewed scientific literature and therefore assert that preclusion under prong two of Rule 702 discussed above is appropriate. Defendant then relies on cases where the plaintiff's expert(s) offered such opinion(s), in a different case, circuit and context, and then asks this Court to therefore preclude Plaintiffs' experts, in this case, from offering certain testimony. The primary flaw with this reasoning is that Plaintiffs experts in this case did not opine that brachial plexus injuries "must result" from a clinician applying excessive

8

traction to a baby's head during delivery. Plaintiffs experts are not offering testimony **based solely** on the premise that a brachial plexus injury occurred ergo the birth attendant applied excessive traction. Movant, on the other hand, contends that a brachial plexus injury occurred ergo it was secondary to natural forces of labor while wholly ignoring (and omitting from defendant's presentation to this Court) the deposition testimony of both parents that Dr. Bui forcefully pulled the infants head during delivery; so much that so that they were concerned Dr. Bui would pull the patient off the bed. (Janis Decl. Ex 8-9).

The infant's mother Asseta Nanema, testified that Dr. Bui was "pulling up" (Janis Decl. Ex 8, p. 20; p. 22, lines 22-23). Dr. Bui was "pulling so strongly that I moved down from the bed." (Id.). Ms. Nanema testified that "my son was stuck and she [Dr. Bui] was pulling up so strongly…" " I can feel she was pulling up and nothing was going out and I can feel the power and propensity of the way she was pulling up." (Id. p. 22).

The infant's father Hamidou Guira testified that once his wife began pushing, "the baby's head came outside and it was clear that the baby was stuck, because they could not – it could not come out." He testified "I seen the doctor pull the baby's head and I was even concerned. I felt like she was gonna pull my wife out of the table…" (Janis Decl. Ex 9, p.14). "She was pulling the head outside." (Id. at page 15, line 8).

Relying on the mother's deposition testimony, Dr. Adler testified that "she [the mother] was nearly pulled off the delivery table by the amount of pulling supplied by the doctor." (Janis Decl. Ex 5, p.39, 18-21).

Dr. Bui testified that during the delivery she held the infant's head with her hands. ((Janis Decl. Ex 7, p.15). Dr. Bui testified that she applied traction but it was not excessive. (Id. p. 44).

By omitting presentation of the parents deposition testimony to this Court, movant is not

offering this Court a full picture of what occurred. Movant would like this Court to believe (albeit erroneously) that Plaintiffs experts rationale is simply that Erbs Palsy occurred ergo Dr. Bui committed malpractice; but neither expert offered such an opinion. It is certainly reasonable for Plaintiffs experts to rely, in part, upon the parents testimony of forceful pulling in forming their expert causation opinions. No expert on either side disagrees, in terms of general causation, that excessive pulling from the birth attendant can cause Erbs Palsy.

In regards to the subject of general causation, Dr. Adler in his expert report opined that there can be alternative causes to a brachial plexus to a newborn other than excessive traction exerted by a healthcare provider including cancer, infection and rarely stretching of nerves can be exaggerated when the fetus has muscle atrophy in the head and neck or suffers intrapartum hypoxia sufficient to cause fetal hypotonia and acidosis. Umar Guira, he opined, has none of the foregoing medical conditions. (Janis Decl. Ex 1) (See also, Janis Decl. Ex 5, pp. 70, 9-18; 78-79; 90, 101-102). Dr. Luciani offered similar opinions. (See, e.g., Janis Decl. Ex 6. P. 26, lines 4-9). Thus neither expert simply worked backward from incident of Erbs Palsy to opinion that it "must result" from excessive traction.

**B. Plaintiffs Experts Should Not Be Precluded From Offering Opinions Contesting Defendant's Assertion That Permanent Brachial Plexus Injuries Can Be Caused By Natural Forces of Labor.**

This discussion pertains to two categories. i.e., general causation and specific causation. The question posed in terms of general causation is can maternal forces cause an Erbs Palsy injury? As to specific causation, the question is whether <u>in this specific case</u> did maternal forces cause the Erbs Palsy?

Movant leaps from a general causation opinion that natural forces of labor can (purportedly) cause permanent NBPP to a specific causation opinion that ergo NFOL caused the

permanent NBPP in this case. Defense has offered no evidence to support this specific causation theory. Indeed, the defense experts offer nothing but bare and conclusory opinions about the subject of maternal forces being the cause. Defense expert Keith Eddleman, M.D. in his report concedes "I have basic knowledge about BPI" and then speculates that "It is also possible that the BPI occurred before delivery. The mechanism for such an injury is fetal malpositioning in the uterine cavity that causes excessive prolonged stretching of the brachial plexus nerve roots." (Janis Decl. Ex 4). This is shaky ground from which to move to preclude Plaintiff's experts. Defense expert Walter J. Molofsky, M.D. offers a conclusory opinion that "There is nothing in the records to indicate that anything untoward happened" [ignoring the parents testimony about excessive pulling occurring]. "It is thus my opinion that the brachial plexus injury noted at birth was due to intrinsic forces of labor and delivery that effected the posterior arm. (Janis Decl. Ex 2). Notably Dr. Bui was unable to identify evidence of same at her deposition. For instance, she identified potential causes of NBPP injuries that can be secondary to in utero mechanisms. She testified that in utero it can occur with malpositioning or trauma in utero, in particular compression trauma. But she was unable to opine that either malpositioning or compression trauma occurred in this case. Asked at her deposition whether there was fetal malpositioning or compression trauma, Dr. Bui testified "I don't know". (Janis Decl. Ex 7, p. 24, lines 2-14). Nor did she testify that shoulder impaction occurred in this case and she denies that shoulder dystocia occurred despite relying on cases where NFOL was alleged in unison with shoulder dystocia or shoulder impaction. For instance, movant relies on Bayer ex rel. Petrucelli v. Dobbins 885 N.W.2d 173 (Wis., Ct. App. 2016) but that case, involving a fact pattern with shoulder dystocia, is distinct from the instant case in that in this case Dr. Bui contends that U.G.'s shoulders delivered "atraumatically" with no shoulder dystocia or shoulder impaction. (Janis Decl. Ex 18)(

11

(See also, Janis Decl. Ex 7. p. 39, lines 8-9). Notably in Bayer, supra, it was Plaintiff who moved to preclude defense from offering expert testimony regarding the maternal forces of labor theory. Movant's reliance on Estate of Ford v. Eicher 250 P.3d 362 (Colo. 2011), Castro v. United States 2016 WL 5942354 (M.D. Fla., Oct. 13, 2016), Clark ex rel. Clark v. Heidrick, 150 F.3d 912 (8th Cir. 1998), D'Amore v Cardwell, 2008 WL 852791 (Ohio Ct. App. March 31, 2008), Fonville v. Zeid, 327 So.3d 658 (Miss. Ct. App. 2021), Lawrey v. Good Samaritan Hosp., 751 F.3d 947 (8th Cir. 2014), Potter ex rel. Potter v. Bowman, 2006 WL 3760267 (D. Colo. Dec. 18, 2006), Salvant v. State, 935 So.2d 646 (La. 2006), Silong v. United States, 2007 WL 25351267 (E.D. Cal. Aug. 31, 2007), Taber v. Roush, 316 S.W.3d 139 (Tex. App. 2010), Williams v. United States, 455 F. Supp. 3d 403 (E.D. Mich. 2020) is also flawed for the same reason as those cases involved a fact pattern with the occurrence of shoulder dystocia and movant contends in this case that shoulder dystocia did not occur. More so, absent from Potter, Williams, and L.M. was any testimony that birth attendant applied traction to the baby's head. In Bayer, there was no description that the infant's "neck was bent" during delivery or that excessive traction was applied as opposed to this case where both parents witnessed the delivery and testified that excessive pulling upward of the head occurred.

The instant case is distinguished from *Lawrey v. Kearney Clinic, P.C.,* No. 8:11CV63, 2012 WL 3583164, (D. Neb. Aug. 20, 2012), in part, in that neither Dr. Luciani or Dr. Adler testified that brachial plexus injuries are always the result of traction applied to the infant's head and neck by the birth attendant. Notably, in Lawrey there was no evidence that the delivering physician applied any traction during birth. In the instant case there is evidence of traction applied to the infants head from witness testimony of both the mother and father describing forceful pulling. (Janis Decl. Ex 8 and 9). Dr. Bui testified that during the delivery she held the

12

infant's head with her hands albeit she contends that traction she applied to the infant's head was not excessive. (Janis Decl. Ex 7, p. 15, lines 14-23).

Movant is unable to describe the precise manner in which maternal forces of labor caused U.G.'s injury. For instance, in Estate of Ford, supra, cited to by movant, the court found that the defense expert "linked the specific clinical facts of the delivery" in arriving at opinion that maternal forces involved. In this instance movant leaps from a general causation proposition to ergo same occurred in this case; but absent is facts to support same specifically occurring in this case.

Movant's reliance on Ambrose v. Brown 96 N.Y.S.3d 414 is also flawed. In the foregoing case, the Court found that defendant met both the specific and general causation prongs of the "Parker" test and held that therefore the trial court did not abuse its discretion in allowing defendants to set forth a defense that "the injuries sustained by the child could have occurred during the birthing process". See, Parker v Mobil Oil Corp (7 NY3d 434). See also Muhammad v. Fitzpatrick 91 AD3d 1353.

Defense also relies upon L.M. ex rel. Dussault v. Hamilton, 200 Wash. App. 535 (2017). That case is distinguished from the instant case, in part, in that defendants in the foregoing case had a biomechanical expert who they relied upon to offer a maternal forces argument. Movant in this case does not have a biomechanical expert. Notably the Court in L.M. Hamilton referenced the subject ACOG compendium, to wit:

> ACOG issued an important report in 2014 entitled Neonatal Brachial Plexus Palsy. This report discusses anterior shoulder NBPP to explain that an infant **with low injury tolerance** might suffer transient or persistent NBPP due to NFOL absent obstetric maneuvers. (Emphasis added).

Dr. Adler directly addressed in his expert report the subject of maternal forces and whether same can cause a permanent neonatal brachial plexus injury. Notably he did not opine

13

that same is impossible; rather he stated that it has not been proven to be the cause of a permanent neonatal brachial plexus injury when the fetus does not have exaggerated risk of nerve stretch. (Janis Decl. Ex 1) (Janis Decl. Ex 5, pp. 78-79). Dr. Adler testified "**I'm certainly not suggesting that every single case of permanent injuries result in obstetrical actions. I'm saying that there are other causes and some babies have exaggerated risk.** (Emphasis added) (Janis Decl. Ex 5. P. 87, lines 18-21). Dr. Adler testified that injuries of this type do not occur in a healthy newborn, without other medical conditions or deformities. (Janis Decl. Ex 5). He explained, in part, "some babies have abnormal anatomy, abnormal bones, abnormal muscle and some babies are asphyxiated, meaning that they have been deprived oxygen in intrauterine basis and they can have very low muscle tone and have too much acid in their blood during the labor and they can have – and they cannot be able to withstand the stretching that occurs during labor itself when the baby comes into contact with the pubic bone or stretching [applied by birth attendant]". He continued "Those babies have exaggerated risk of brachial plexus injury." (Janis Decl. Ex 5. P. 79, lines 2-24). This is supported by the court in L.M Hamilton referencing same occurring in infants with "low injury tolerance". Dr. Adler further testified that U.G. had none of the foregoing symptoms. (Id.).

Movant's reliance on the Eleventh circuit case of *Castro v. United States*, No. 2:15-CV-378-FTM-38CM, 2016 WL 5942354, at \*1 (M.D. Fla. Oct. 13, 2016) is also flawed. In Castro, defense contended that natural forces of labor coupled with posterior shoulder dystocia caused the injury. In Castro, defense argued that there was posterior shoulder impaction at the level of the sacral promontory and therefore it would not be possible for the clinician to apply extraction forces because the head was not delivered. In the instant matter there is only speculation that there was posterior shoulder impaction at the level of the sacral promontory. More so, in this

14

case is there is witness testimony, of both parents, that forceful pulling as applied to infant's head by Dr. Bui. (Janis Decl. Ex 8 and 9). In Castro, defendant called the court's attention to the Lawrey case but Lawrey is distinguished from the instant case in that Lawrey involved a fact pattern with posterior shoulder dystocia and no evidence of traction.

## CONCLUSION

For the foregoing reasons, it is respectfully submitted that this Honorable Court should not preclude Dr. Luciani and Dr. Adler from certain testimony, i.e., (1) a brachial plexus injury could not have occurred absent the movement of U.G.'s head by Dr. Bui, and (2) that the forces of labor could not have caused U.G.'s injuries.

Dated: New York, New York
June 4, 2022

>DOUGLAS & LONDON, P.C.
>Attorneys for Plaintiff
>
>BY: */s/ Randolph Janis*
> Randolph Janis
> 59 Maiden Lane, 6th Floor
> New York, New York 10038
> (212) 566 7500

## CERTIFICATE OF SERVICE

I Randolph D. Janis hereby certify that on June 4, 2022 the foregoing:

Plaintiffs' Memorandum of Law In Opposition to Defendant United States of America's Motion in Limine to Preclude Certain Expert Testimony of Richard L. Luciani and dr. Daniel Adler, together with Declaration of Randolph Janis, Esq and supporting exhibits was served via electronic means and U.S. mail to

U.S. Attorneys Office

86 Chambers Street, 3rd Floor

NY NY 10007

Attorneys for defendants

/s/ Randolph D. Janis
───────────────

Randolph D. Janis