USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/13/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
U.G., an infant, by his mother and natural
guardian, ASSETA NANEMA, and ASSETA
NANEMA, individually,[1]

                                    Plaintiffs,            21-CV-2615 (VEC)

              -against-

                                                         OPINION AND
UNITED STATES OF AMERICA,                          ORDER

                                  Defendant.
-------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

       Plaintiffs, a mother and her child, bring this medical negligence and malpractice case against the United States pursuant to the Federal Tort Claims Act based on the child's permanent brachial plexus injury sustained during birth. Plaintiffs allege that their obstetrician, a federal employee, caused the injury by using excessive force on the child's head and shoulders during delivery. *See generally* Compl., Dkt. 1. The Government has filed a motion to preclude Plaintiffs' experts from testifying that (1) the child's injury could not have occurred absent the doctor's movement of his head and (2) the mother's forces of labor could not have caused the child's injury. *See* Def. Not. of Mot., Dkt. 36. For the following reasons, Defendant's motion is GRANTED.

    **I.**      **BACKGROUND**

    **A. Plaintiffs' Claim**

       Plaintiff Asseta Nanema ("Nanema") gave birth to U.G. ("U.G.") in the early morning hours of October 2, 2018. Delivery Note, Dkt. 38-2, 2; Luciani Report, Dkt. 38-1, at 3. The

---

[1]       The caption of the case has been changed to conform to the requirements of Fed. R. Civ. P. 5.2(a)(3).

attending physician was Dr. Sandy Lau Biu ("Dr. Bui"), an obstetrician and gynecologist employed by Defendant. *See* Compl. ¶¶ 12–17, 21–22; Delivery Note at 1. Nanema was in labor for two hours and gave birth to U.G. vaginally. Delivery Note at 1–2. Dr. Bui did not document any complications associated with the delivery and recorded that U.G.'s "shoulders and body were delivered atraumatically." *Id.* at 2. Dr. Bui also recorded that there was no "[s]houlder dystocia." *Id.* at 1.[2]

Shortly after his birth, U.G. was diagnosed with permanent Erb's palsy affecting his right arm. Adler Report, Dkt. 38-3, at 3–4. Erb's palsy is a disorder in which the brachial plexus, a group of nerves near the shoulder that connects the spine to the arm and hand, is stretched or torn.[3] U.G.'s medical records at the time of his birth note weakness in his right arm and evidence of bruising, but no bone abnormalities or fractures. *Id.* at 3. In the months and years following U.G.'s birth, multiple physicians have confirmed the Erb's palsy diagnosis. *See id.* at 3–7.

Plaintiffs filed this action on March 25, 2021. *See generally* Compl. Plaintiffs primarily allege that Dr. Bui committed malpractice because she used excessive force on U.G.'s head and shoulders during delivery, injuring his brachial plexus and causing permanent Erb's palsy. *Id.*

On April 29, 2022, Defendant filed a motion pursuant to Federal Rule of Evidence 702 to preclude expert testimony that "(1) a brachial plexus injury could not have occurred absent the movement of U.G.'s head by Dr. Bui, and (2) that the forces of labor could not have caused U.G.'s injuries." Def. Mem. in Supp. of Mot., Dkt. 37, at 15.

---

[2] Shoulder dystocia is the condition that occurs during a vaginal delivery in which one or both of the baby's shoulders get stuck on the mother's pelvic bones. *See* Royal College of Obstetricians and Gynaecologists Guideline ("RCOG Guideline"), Dkt. 38-7, at 1.

[3] Erb's palsy is sometimes referred to as a brachial plexus injury. This Order solely refers to neonatal brachial plexus injuries, meaning those that affect newborn babies.

### B. Plaintiffs' Expert Testimony

Plaintiffs have proffered two experts: Richard Luciani ("Dr. Luciani"), an obstetrics and gynecology specialist, and Daniel Adler ("Dr. Adler"), a pediatric neurology specialist.

#### 1. Dr. Luciani

In his October 15, 2021 expert report (the "Luciani Report"), Dr. Luciani opined:

- "In the absence of underlying medical causes," a permanent brachial plexus injury is caused by an obstetrician's "excessive" traction, as "[n]atural labor forces will not result" in a permanent injury of this kind;

- Although literature from the American College of Obstetricians and Gynecologists provides that "transient [brachial plexus] injuries have been attributed to the labor process," permanent injuries have not been attributed to maternal forces during labor;

- If maternal forces of labor were responsible for causing Erb's palsy, the injury would be just as frequent in caesarian section births that follow a period of labor as in vaginal births, but, in fact, brachial plexus injuries are "extremely rare" in such cases;

- There was "no evidence of cancer or infection that could potentially injure" U.G.'s brachial plexus nerves; and

- "Obstetrical negligence during the delivery process by Dr. Bui caused the permanent brachial plexus injury noted in this case." Luciani Report, Dkt. 38-1, at 5.[4]

---

[4] On December 11, 2021, Dr. Luciani provided an addendum to his report after reviewing the depositions of Dr. Bui, Nanema, and U.G.'s father. *See* Luciani Report, Dkt. 38-1, at 7. His opinion did not change in any way.

When deposed, Dr. Luciani testified that the "totality of the evidence" led him to conclude that Dr. Bui caused U.G.'s injury. Luciani Dep., Dkt. 42-6, at 25:22-24. He further testified that he believes "there are a number of possible causes of Erb's palsy and Erb's palsy injury," but that he can "rule out several of them [in this case] such as tumor, infection, genetic abnormality, malpositioning, et cetera . . . ." *Id.* at 26:4-9. Finally, Dr. Luciani testified that a child cannot suffer permanent Erb's palsy from a mother's forces of labor in the absence of underlying conditions. *Id.* at 26:10-28:12.

### 2. Dr. Adler

In his November 19, 2021 expert report (the "Adler Report")[5], Dr. Adler opined:

- An infant's underlying medical conditions such as cancer, infection, or muscle atrophy can exaggerate the risk of nerve stretch during delivery;

- Maternal forces of labor "have never been proven to be the cause of a permanent" brachial plexus injury "when the fetus does not have exaggerated risk of nerve stretch";

- U.G.'s medical records do not indicate that he had any underlying conditions that would exaggerate the risk of nerve stretch;

- The fact that U.G.'s right arm was located in a posterior position during delivery does not prove that any nerve damage occurred in the uterus; and

---

[5]  Dr. Adler initially issued a report on October 19, 2021, but he stated during his deposition that the November 19, 2021 report was "designed to update and replace the [earlier] report." Adler Dep., Dkt. 42-5, at 31:24–32:2.

- The nerve stretch that caused U.G.'s injury occurred after his head was delivered when Dr. Bui moved his "head away from the injured right arm. . . ." Adler Report at 6–7.

When he was deposed, Dr. Adler testified that "Dr. Bui put forth efforts to deliver [U.G.] and in doing so caused the nerves to be stretched and torn." Adler Dep., Dkt. 42-5, at 70:6-8. Dr. Adler stated that the basis of his opinion is "[t]he totality of the medical record . . . ." *Id.* at 70:9-10. He opined that "injuries of this type do not occur at any [] time in a healthy newborn, meaning, without other medical conditions or deformities . . . except after the head delivers and the doctor moves the head." *Id.* at 70:9-18. Dr. Adler further testified that "[t]he injury is proof of what happened." *Id.* at 95:10-14.

## II.     LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony so long as:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts . . . .

The party offering expert testimony bears the burden of establishing by a preponderance of the evidence that the testimony satisfies Rule 702. The district court is, however, the "ultimate gatekeeper." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks and citation omitted). Rule 702 tasks the trial judge with "ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

The threshold question for the Court is whether the "proffered expert testimony is relevant. . . ." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). If it is, the Court must then determine whether it has "a sufficiently reliable foundation to permit it to be considered." *Id.* (internal quotation marks and citation omitted). The goal of *Daubert* and Rule 702 is to admit reliable expert testimony that will be helpful to the trier of fact while keeping the courtroom free of junk science. *Id*. at 267. The Supreme Court has articulated several factors that are pertinent to this inquiry, including "whether a theory or technique . . . can be (and has been) tested"; "whether the theory or technique has been subjected to peer review and publication"; whether uniform "standards controlling the technique's operation" exist; and whether the theory or technique enjoys "general acceptance" within an identifiable relevant scientific or professional community. *Daubert*, 509 U.S. at 593–94. The Court's ultimate objective is to "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

### III.   DISCUSSION

As a threshold matter, the Court concludes that testimony regarding the cause of U.G.'s injury is relevant, that the trier of fact will need expert testimony to resolve the question of the cause of U.G.'s injury, and that, by education and training, Doctors Luciani and Adler possess the knowledge, skill, experience, training, and education necessary to offer expert testimony on the cause of U.G.'s injury.

The Court is not satisfied, however, that Plaintiffs' experts have a sufficiently reliable foundation for their opinions about the cause of U.G.'s injury. Defendant argues that Plaintiffs' experts' opinions are contrary to current peer-reviewed scientific literature, which recognizes that maternal forces of labor alone can cause permanent brachial plexus injuries. Def. Mem. in Supp. of Mot. at 9–13. Defendant also points to judicial decisions in which courts have accepted the 2014 Monograph from the American College of Obstetricians and Gynecologists on neonatal brachial plexus injury ("the ACOG Monograph") as stating the current scientific consensus on the cause of such injury. *Id.* In opposition, Plaintiffs assert that the scientific literature on which Defendant relies supports the conclusion that transient, not permanent, brachial plexus injury may result from maternal forces of labor alone, and that, to the extent ACOG concluded that permanent injury may result solely from maternal forces of labor, that conclusion was based on a single unreliable study. Pls. Mem. in Opp., Dkt. 41, at 3–7. Plaintiffs further argue that Defendant failed to recognize two nuances informing their experts' opinions with respect to the cause of U.G.'s injury: U.G. had no underlying conditions associated with enhanced risk of brachial plexus injury and the parents testified that Dr. Bui used force during U.G.'s birth. *Id.* at 1–3, 8–9, 13–14.[6] Significantly, Plaintiffs did not point to a single peer-reviewed publication that supports the premise of their experts' opinions, to wit: absent an underlying condition that enhances the risk of brachial plexus injury, maternal forces of labor cannot alone cause permanent brachial plexus injury.

The Court agrees with Defendant that the medical literature recognizes that permanent brachial plexus injury may result from the natural forces of labor alone, and that Plaintiffs'

---

[6] Plaintiffs spent a significant portion of their brief criticizing the opinions of Defendant's experts, as well as Dr. Bui's testimony, but Plaintiffs did not file a cross-motion to exclude any of Defendant's evidence. The Court, therefore, does not address Plaintiffs' critiques.

experts have failed to proffer a case-specific analysis to support their opinions regarding the cause of U.G.'s injury. The ACOG Monograph has been widely endorsed by gynecological/obstetrical organizations[7] and courts, *see* Def. Mem. in Supp. of Mot. at 9–11, and its conclusion was reaffirmed by ACOG in 2019, *see* ACOG, *Neonatal Brachial Plexus Palsy*, https://www.acog.org/clinical/clinical-guidance/task-force-report/articles/2014/neonatal-brachial-plexus-palsy (last visited Oct. 11, 2022). The ACOG task force that prepared the monograph was composed of doctors and professors (including maternal-fetal medicine specialists, a neonatologist, a neurosurgeon, and a biomechanical engineer). The task force carefully reviewed and evaluated existing literature on the subject. *See* ACOG Monograph, Dkt. 38-6, at v-xi. The task force clearly concluded that permanent brachial plexus injuries may result solely from the forces of labor. As articulated in the ACOG Monograph, brachial plexus injuries "ha[ve] been shown to occur entirely unrelated to [a physician's application of] traction, with studies demonstrating cases of both transient and persistent [brachial plexus injuries] in fetuses delivered vaginally." *Id.* at 17.[8] Moreover, "severe and persistent injuries may occur to the brachial plexus without the clinician's application of traction during delivery." *Id.* at 28.[9] The

---

[7]     Organizations that endorsed the ACOG Monograph include the American Academy of Pediatrics, the American Academy of Physical Medicine and Rehabilitation, the American College of Nurse-Midwives, the American Gynecological and Obstetrical Society, the American Society for Reproductive Medicine, the Child Neurology Society, the Japan Society of Obstetrics and Gynecology, the Royal Australian and New Zealand College of Obstetricians and Gynecologists, the Society for Maternal-Fetal Medicine, and the Society of Obstetricians and Gynecologists of Canada. *See* American College of Obstetricians and Gynecologists Monograph ("ACOG Monograph"), Dkt. 38-6, at xiv.

[8]     In support, the ACOG Monograph cites R.B. Gherman et al., *Spontaneous vaginal delivery: a risk factor for Erb's palsy?* 178 Am. J. Obstetrics & Gynecology 423 (1998) [hereinafter "1998 Gherman Study"]; Robert Allen & Edith Gurewitsch, *Temporary Erb-Duchenne palsy without shoulder dystocia or traction to the fetal head*, 105 Obstetrics & Gynecology 1210 (2005); Henry Lerner & Eva Salamon, *Permanent brachial plexus injury following vaginal delivery without physician traction or shoulder dystocia*, 198 Am. J. Obstetrics & Gynecology e7 (2008) [hereinafter the "Lerner-Salamon Study"]; R.B. Gherman et al., *Brachial plexus palsy associated with caesarean section: an in utero injury?* 177 Am. J. Obstetrics & Gynecology 1162 (1997) [hereinafter "1997 Gherman Study"]).

[9]     In support, the ACOG Monograph cites R.B. Gherman et al., *Brachial plexus palsy: an in utero injury?*, 180 Am. J. Obstetrics & Gynecology 1303 (1999) [hereinafter "1999 Gherman Study"]).

ACOG Monograph discusses several studies identifying "persistent" brachial plexus injuries caused by the forces of labor alone. *See id.* at 27–29. Finally, the ACOG Monograph observes that "[n]o published clinical or experimental data exist to support the contention that the presence of persistent (as compared to transient) [brachial plexus injuries] implies the application of excessive force by the birth attendant." *Id.* at 28.

The ACOG Monograph's conclusion is buttressed by two other peer-reviewed publications: a 2020 article (the "Johnson Article") stating that "forces other than those applied during maneuvers to relieve shoulder dystocia are the cause of at least half of cases of brachial plexus injury," Johnson Article, Dkt. 38-8, at 725 (internal citation omitted), and a 2005 guideline by the Royal College of Obstetricians and Gynaecologists (the "RCOG Guideline"), which states: "Not all injuries are due to excess traction by the [birth attendant] and there is now a significant body of evidence that maternal propulsive force may contribute to some of these injuries," RCOG Guideline, Dkt. 38-7, at 1.

Plaintiffs attack only the ACOG Monograph, and their arguments regarding it are unpersuasive. First, Plaintiffs contend that the ACOG Monograph addresses "persistent" injuries, but not "permanent" ones. *See* Pls. Mem. in Opp. at 3–4. The ACOG Monograph defines "persistent" brachial plexus injuries as those lasting "12 or more months after birth," ACOG Monograph at 1, which is largely consistent with Dr. Adler's definition of a "permanent" brachial plexus injury as one that extends beyond one to two years of a child's life, Adler Dep. at 77:24-78:6. The ACOG Monograph's use of the term "persistent" rather than "permanent" is, therefore, inconsequential. In any event, both the ACOG Monograph and the Johnson Article conclude that there is no support for the theory that "transient brachial plexus injury may occur as a result of . . . uterine forces but permanent injury could only occur as a result of excessive,

9

physician applied traction . . . ." Johnson Article at 728 (citing the ACOG Monograph); *see also* ACOG Monograph at 28. Plaintiffs fail to address this conclusion at all, even though it is diametrically opposed to the premise of their experts' opinions.

Second, Plaintiffs argue that even if the ACOG Monograph were to endorse the view that permanent brachial plexus injuries may result from the forces of labor alone, this "theory" depends entirely on the unreliable article written by Doctors Henry Lerner and Eva Salamon (the "Lerner-Salamon Article") that is cited in the ACOG Monograph. Pls. Mem. in Opp. at 4–7. The conclusion of the ACOG Monograph does not rely solely on the Lerner-Salamon Article. It cites the article as one example of a study finding "persistent" brachial plexus injuries without evidence of clinician-applied traction, *see* ACOG Monograph at 17 (citing the Lerner-Salamon Article among four studies), and briefly mentions the study when concluding that "[a] single case report" is insufficient scientific evidence to support a bright line division between the causes of transient and persistent brachial plexus injuries, *id.* at 28. The ACOG Monograph therefore expressly declines to draw conclusions based solely on the Lerner-Salamon Article. Moreover, the Johnson Article, which Plaintiffs do not mention, let alone challenge, does not cite the Lerner-Salamon Article at all, and it also concludes that there are numerous reports of both transient and permanent brachial plexus injury occurring during vaginal deliveries and caesarean deliveries,[10] demonstrating that "forces other than those applied during maneuvers to relieve

---

[10] Although Dr. Luciani's point that one would expect to see an equal number of brachial plexus injuries in vaginal births as in caesarian births that follow hours of labor if the forces of labor were the cause of the injury may be well-taken, *see* Luciani Dep., Dkt. 42-6, at 26–27, Plaintiffs have not advanced any peer-reviewed literature undermining the conclusions drawn by the ACOG Monograph, the Johnson Article, or the RCOG Guideline by studying this theory.

shoulder dystocia are the cause of at least half of cases of brachial plexus injury." Johnson Article at 725.[11]

Finally, courts that have considered whether ACOG's review of the brachial plexus injury literature reliably establishes that permanent brachial plexus injury may be caused by the forces of labor alone have consistently held that it does.[12] *See Castro v. United States*, No. 2:15-cv-378-FtM-38CM, 2016 WL 5942354, at *4–6 (M.D. Fla. Oct. 13, 2016) (granting the government's cross-motion to preclude a plaintiff's experts from testifying that the natural forces of labor could not cause permanent brachial plexus injuries and deeming the ACOG Monograph "[p]articularly persuasive"); *LaBauve v. La. Med. Mut. Ins. Co.*, No. 2021-C-00763, 2022 WL 1101720, at *8–9 & n.3 (La. Apr. 13, 2022) (concluding that the trial court did not abuse its discretion in admitting testimony from defendant's expert that the forces of labor caused a permanent brachial plexus injury and citing the ACOG Monograph); *Bayer ex rel. Petrucelli v. Dobbins*, 885 N.W.2d 173, 180–81 (Wis. Ct. App. 2016) (concluding that the trial court erred by excluding defendant's evidence that maternal forces caused the plaintiff's permanent brachial plexus injury in part because it failed adequately to consider the ACOG Monograph).

In an attempt to distinguish their testimony from the outdated view of the cause of Erb's palsy that was soundly rejected by ACOG, Plaintiffs' experts maintained that they concluded that Dr. Bui caused U.G.'s injuries because he did not have any underlying conditions. Pls. Mem. in

---

[11] The Johnson Article cites the ACOG Monograph; Manijeh Torki et al., *Severe brachial plexus injury in women without shoulder dystocia*, 120 Obstetrics & Gynecology 539 (2012); the 1997 Gherman Study; the 1999 Gherman Study; and R.B. Gherman et al., *Shoulder dystocia: the unpreventable obstetric emergency with empiric management guidelines*, 195 Am. J. Obstetrics & Gynecology 657 (2006).

[12] Plaintiffs cite an oral order in *Seiber v. Antkowiak et al.*, No. 11-CV-000942 (Wis. Cir. Ct. Mar. 26, 2013), Dkt. 42-13, in which a Wisconsin judge excluded references to the Lerner-Salomon Article at trial. But, unlike in that case, Defendant does not seek to offer testimony based on or regarding that article. Defendant is moving to exclude Plaintiffs' expert testimony based on the other studies and literature reviews discussed in this Opinion.

Opp. at 2, 10.  But neither party is asserting that U.G.'s injuries were or may have been caused by any underlying condition.  Plaintiffs' experts' assertions that they ruled out a third potential cause of injury does not make their *ipse dixit* opinions admissible.  In a similar vein, Plaintiffs argued in their brief in opposition to Defendant's motion that their experts' opinions were informed by the depositions of the parents and of Dr. Bui.  Pls. Mem. in Opp. at 9–10.  But their own experts testified otherwise.  Dr. Luciani testified that the depositions merely "solidif[ied]" his opinion after it was already formed.  Luciani Dep. at 25:22–26:3.  As for Dr. Adler, he testified that "[t]he injury is proof of what happened" and that he did not change his opinion after reviewing the depositions.  Adler Dep. at 31:8–20, 95:10–14.

The Court has reviewed Plaintiffs' expert reports and their depositions.  It is absolutely clear that the premise for their opinions is that, absent certain pre-existing conditions that can exaggerate the baby's risk of nerve stretch during delivery, the sole possible cause of permanent brachial plexus injury is the use of traction by the person delivering the baby.  That premise is simply not supported by the scientific literature.  For that reason, their opinions are not admissible.

## CONCLUSION

For the foregoing reasons, Defendant's motion to preclude Plaintiffs' experts from testifying that (1) U.G.'s injury could not have occurred absent the delivery room doctor's movement of his head and (2) Nanema's forces of labor could not have caused U.G.'s injury is GRANTED. The parties are ordered to meet and confer and to file a joint proposed schedule for next steps in the case not later than **October 28, 2022**. The Court is happy to refer the parties to Magistrate Judge Willis for a settlement conference upon a joint request. The Clerk of Court is respectfully directed to close docket entry 36.

**SO ORDERED.**

Date: **October 13, 2022**
**New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**